1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11   PHILLIP MOSIER,                          No. 2:13-cv-00744-MCE-KJN

12              Plaintiff,

13        v.                                  **MEMORANDUM AND ORDER**

14   CENTRAL INTELLIGENCE AGENCY,

15              Defendant.

16

17        In the present action, Plaintiff Phillip Mosier ("Plaintiff") sues the Central

18   Intelligence Agency ("CIA" or "Agency") for the CIA's alleged noncompliance with

19   Plaintiff's requests for information pursuant to the Freedom of Information Act ("FOIA"),

20   5 U.S.C. § 552.  Plaintiff and the CIA both move for summary judgment.[1]  Mots., ECF

21   Nos. 26, 27.

22   ///

23   ///

24   ///

25   ///

26   ///

27   _____

28        [1] Because oral argument will not be of material assistance, the Court ordered this matter
     submitted on the briefs.  E.D. Cal. Local R. 230(g).

1

2

**BACKGROUND**

3        Plaintiff filed a FOIA request with the CIA on September 28, 2009 seeking "all

4    information and records regarding Phillip Lee Mosier, including but not limited to

5    documents, files, photographs, videotapes and pictures."  ECF No. 1 Ex. 1.  Plaintiff

6    stated in his request that he was interviewed by the CIA and other organizations in

7    Lebanon, Missouri in summer 1966.  ECF No. 1 Ex. 1.  The CIA responded on January

8    19, 2010, indicating that because the agency previously conducted a search for records

9    regarding Plaintiff, it would only perform an updated search from December 14, 2005

10   (the date of the CIA's acceptance of Plaintiff's prior FOIA request) through January 19,

11   2010.  ECF No. 1 Ex. 2; Lutz Decl. ¶ 7.  Plaintiff objected to the CIA's limited search and

12   requested "all documents in the possession of the CIA (not just CIA-originated

13   documents as described in [the CIA's] letter) from 1964 to the present regarding

14   [Plaintiff]."  ECF No. 1 Ex. 3; Lutz Decl. ¶ 8.

15       On March 29, 2010 the CIA replied that it conducted a search with no date

16   restrictions through March 9, 2010 for all documents in CIA's possession.  ECF No. 1

17   Ex. 4.  The CIA searched for "responsive records that might reflect an open or otherwise

18   acknowledged Agency affiliation."  ECF No. 1 Ex. 4.  The CIA indicated that it was

19   unable to locate any such information or records.  Id.  The letter also stated that "[s]ome

20   of the records [Plaintiff] requested were from files that are retained only for a short period

21   of time in accordance with the approved schedules of the National Archives and Records

22   Administration."  Id.  This security file on Plaintiff was destroyed in 1996.  Id.; Lutz

23   Decl. 23.

24   ///

25   ///

26   ///

27   ///

28   ///

2

1    Finally, the CIA stated that

> [w]ith respect to responsive records that would reveal a classified connection to the CIA, in accordance with section 3.6(a) of Executive Order 12958, as amended, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request.  The fact of the existence or nonexistence of requested records is currently and properly classified and relates to CIA intelligence sources and methods information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended.

ECF No. 1 Ex. 4.  The CIA cited FOIA exemptions (b)(1) and (b)(3), as well as Privacy Act ("PA") exemptions (j)(1) and (k)(1) as the basis for its denial of Plaintiff's request.  Id.

On May 7, 2010, Plaintiff filed an appeal of the CIA's FOIA response with the Agency Release Panel.  ECF No. 1 Ex. 5.  On December 23, 2010, the Agency Release Panel denied Plaintiff's appeal, finding that the CIA "made a reasonable effort to search appropriate records systems under the FOIA and the PA."  ECF No. 1 Ex. 6.

Plaintiff filed the present action on December 26, 2012.  ECF No. 1.  The CIA moved for summary judgment on May 2, 2013.   ECF No. 26.  On June 20, 2013 Plaintiff filed a cross-motion also requesting summary judgment.  ECF No. 27.  Both those motions are now before the Court for adjudication.

In its Motion for Summary Judgment, the CIA contends that the agency conducted an adequate search for open responsive records and that the CIA's Glomar Response[2]  was proper under Exemptions (b)(1) and (b)(3).  ECF No. 26.  In support of its position in that regard, the CIA submitted a declaration from Martha M. Lutz, the Chief of the Litigation Support Unit of the Central Intelligence Agency.  ECF No. 26-1.  Plaintiff, on the other hand, argues that the CIA's Glomar Response was improper.  He seeks summary judgment on the grounds that the CIA improperly limited its search for the requested documents, and that the Glomar Response as issued was not supported by the record.  ECF No. 34.

---

[2] The CIA's refusal to confirm or deny the existence of records is known as a "Glomar Response." Hunt v. C.I.A., 981 F.2d 1116, 1118 (9th Cir. 1992); see Phillippi v. Cent. Intelligence Agency, 546 F.2d 1009, 1011 (D.C. Cir. 1976) (upholding CIA refusal to confirm or deny existence of records of CIA connection to activities of ship named the Hughes Glomar Explorer).

In the alternative, Plaintiff requests that the Court conduct an *in camera* review of any documents at issue.  ECF No. 34.

**STANDARD**

Most cases brought pursuant to the FOIA are resolved through summary judgment.  Cooper Cameron Corp. v. U.S. Dep't of Labor, 280 F.3d 539, 543 (5th Cir. 2002).  The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

///

///

4

1  The opposing party must demonstrate that the fact in contention is material, i.e., a fact

2  that might affect the outcome of the suit under the governing law.  Anderson v. Liberty

3  Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W.

4  Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must

5  also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the

6  evidence is such that a reasonable jury could return a verdict for the nonmoving party."

7  Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary

8  question before the evidence is left to the jury of "not whether there is literally no

9  evidence, but whether there is any upon which a jury could properly proceed to find a

10  verdict for the party producing it, upon whom the onus of proof is imposed."  Anderson,

11  477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871))

12  (emphasis in original).  As the Supreme Court explained, "[w]hen the moving party has

13  carried its burden under Rule [56(a)], its opponent must do more than simply show that

14  there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.

15  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to

16  find for the nonmoving party, there is no 'genuine issue for trial.'"  Id. 87.

17       In the FOIA context, the agency responding to a request has the burden of

18  sustaining the adequacy of its response by demonstrating that it did not improperly

19  withhold records subject to disclosure under FOIA.  5 U.S.C. § 552(a)(4)(B); U.S. Dep't

20  of Justice v. Tax Analysts, 492 U.S. 136, 142 n.3 (1989).  The agency must

21  "demonstrate that it has conducted a search reasonably calculated to uncover all

22  relevant documents."  Citizens Comm'n on Human Rights v. Food & Drug Admin.,

23  45 F.3d 1325, 1328 (9th Cir. 1995) (quoting Zemansky v. EPA, 767 F.2d 569, 571

24  (9th Cir. 1985)).  The "issue to be resolved is not whether there might exist any other

25  documents possibly responsive to the request, but rather whether the search for those

26  documents was adequate."  Id. at 1328 (emphasis in original).  An agency may

27  demonstrate the adequacy of its search with "reasonably detailed, nonconclusory

28  affidavits submitted in good faith."  Zemansky, 767 F.2d at 571.

1    In resolving a summary judgment motion, the evidence of the opposing party is to

2  be believed, and all reasonable inferences that may be drawn from the facts placed

3  before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

4  255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

5  obligation to produce a factual predicate from which the inference may be drawn.

6  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

7  810 F.2d 898 (9th Cir. 1987).

8

9                                    **ANALYSIS**

10

11    Plaintiff takes issue with the adequacy of the CIA's response to his FOIA request.

12  First, he contends that the CIA's Glomar Response fails to meet the requirements of

13  FOIA exemptions (b)(1) and (b)(3).  Second, Plaintiff asserts that the Lutz Declaration

14  submitted by the CIA is wholly inadequate to support any of its claimed exemptions.

15  Next, Plaintiff argues that the Court should, in the alternative conduct an *in camera*

16  review of any documents that may be at issue.  Finally, Plaintiff argues that the CIA

17  improperly limited the search for responsive documents to two of the Agency's five

18  directorates.  Each of those contentions will be addressed in turn.

19

20    **A.    FOIA Exemptions (b)(1) and (b)(3)**

21

22    Summary judgment is appropriate in a FOIA case only where the government

23  proves that "the material at issue falls within one of the nine statutory exemptions" found

24  in 5 U.S.C. § 552(b).  Maricopa Audubon Soc. v. U.S. Forest Serv., 108 F.3d 1082, 1085

25  (9th Cir. 1997).  The FOIA exceptions "must be narrowly construed in light of FOIA's

26  dominant objective of disclosure, not secrecy."  Id. (internal citations omitted).

27  ///

28  ///

Here, the CIA contends that its Glomar Response to Plaintiff's FOIA request is proper because the existence of any responsive records that would reveal a classified connection to the CIA falls within two of the nine statutory exemptions: 5 U.S.C. § 552(b)(1) and (b)(3) ("Exemptions 1 and 3").  Exemptions 1 and 3 and are independent and either may provide sufficient grounds for upholding agency action.  See Larson v. Dep't of State, 565 F.3d 857, 862-63 (D.C. Cir. 2009) (noting that "courts may uphold agency action under one exemption without considering the applicability of the other").  Although Exemption 1 or 3 alone would be sufficient to uphold the Agency's withholdings in this case, this Court finds that both exemptions apply here.  Each exemption will be addressed in turn.

### 1.      FOIA Exemption (b)(1)

FOIA Exemption 1 covers records which an agency classifies as "secret in the interest of national defense or foreign policy under criteria established by an Executive Order."  Hunt v. C.I.A., 981 F.2d 1116, 1118 (9th Cir. 1992).  Here, the CIA relies on Executive Order No. 1352675, which states that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."  Exec. Order No. 1352675, Classified National Security Information, 75 FR 707 (available at 2009 WL 6066991).

///
///
///
///
///
///
///

7

1   Executive Order No. 1352675 contains four requirements for classification: (1) an

2   original classification authority is classifying the information; (2) the information is owned

3   by, produced by or for, or is under the control of the United States Government; (3) the

4   information falls within one or more of the categories of information listed in section 1.4

5   of this order;[3] and (4) the original classification authority determines that the

6   unauthorized disclosure of the information reasonably could be expected to result in

7   damage to the national security, which includes defense against transnational terrorism,

8   and the original classification authority is able to identify or describe the damage.  Id.

9   "Though an executive agency's classification decisions are accorded substantial weight,

10  the FOIA permits challenges to Exemption 1 withholdings, requires the district court to

11  review the propriety of the classification, and places the burden on the withholding

12  agency to sustain its Exemption 1 claims."  Wiener v. F.B.I., 943 F.2d 972, 980 (9th Cir.

13  1991).

14      Plaintiff contends that the CIA's Glomar Response fails to meet the requirements

15  of Exemption 1 because the question of whether the CIA possesses responsive records

16  does not fall within any category of classifiable information.  Specifically, Plaintiff objects

17  to the CIA contention that the existence or non-existence of records is classifiable under

18  the rubric of "intelligence sources or methods," "intelligence activities," or "foreign

19  relations or activities."

20      In its declaration, the CIA establishes that all four criteria are met.  ECF No. 26-1;

21  Lutz Decl. ¶ 35-39.  Lutz states that acknowledging the existence of the requested

22  documents is classified because it would threaten ongoing intelligence activities,

23  intelligence sources, and intelligence methods.

---

24      [3] The classification categories listed in section 1.4 include: "(a) military plans, weapons systems,
25  or operations; (b) foreign government information; (c) intelligence activities (including covert action),
    intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United
    States, including confidential sources; (e) scientific, technological, or economic matters relating to the
26  national security; (f) United States Government programs for safeguarding nuclear materials or facilities;
    (g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection
27  services relating to the national security; or (h) the development, production, or use of weapons of mass
    destruction."  Exec. Order No. 1352675, Classified National Security Information, 75 FR 707 (available at
28  2009 WL 6066991).

1  Lutz asserts that

2          "[i]n this case, acknowledging the existence or nonexistence
        of records reflecting a classified connection to the CIA
3          reasonably could be expected to cause damage to the
        national security by alerting individuals of intelligence interest
4          to what methods the CIA employed or did not employ with
        regard to Plaintiff, thus allowing those individuals to
5          determine whether and what countermeasures to make in the
        future to thwart CIA intelligence collection and activities.

6

7  ECF No. 26-1; Lutz Decl. ¶ 51.  Lutz also asserts that if CIA were to acknowledge that

8  the agency possesses records reflecting a classified connection to Plaintiff, the mere

9  disclosure of such information would reveal that he was a target of intelligence

10 collection.  Id. ¶ 52.  Lutz further notes that "[a]n official CIA acknowledgement that

11 confirms or denies the existence or nonexistence of records reflecting a classified

12 connection between the CIA and Plaintiff would reveal clandestine CIA intelligence

13 activities and intelligence sources and methods."  Id.  Lutz therefore determined that the

14 "CIA's only course of action is to invoke a Glomar Response by stating that it can neither

15 confirm nor deny the existence or nonexistence of records reflecting a classified

16 connection to the CIA."  Id.  Lutz concluded that to confirm or to deny the existence or

17 nonexistence of classified CIA records "reasonably could be expected to cause damage

18 to the national security" thereby meeting the criteria establish in Executive Order No.

19 1352675.  Id.

20       The CIA's concerns regarding harm to intelligence sources and methods are often

21 theoretical, and, as a result, courts "must take into account . . . that any affidavit or other

22 agency statement of threatened harm to national security will always be speculative to

23 some extent, in the sense that it describes a potential future harm.  Ultimately, an

24 agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or

25 'plausible.'"  Wolf v. C.I.A., 473 F.3d 370, 374-75 (D.C. Cir. 2007) (internal citations

26 omitted).

27 ///

28

1    ///

2    Here, it is logical and plausible that either confirming or denying the existence or

3    nonexistence of records reflecting a classified connection between Plaintiff and the CIA

4    could reveal intelligence methods, intelligence sources, and ongoing intelligence

5    activities.  See Hunt, 981 F.2d at 1119 (approving the CIA's use of a Glomar Response

6    because the court found that "[t]o confirm or deny the existence of records on [potential

7    intelligence target] could therefore reveal intelligence sources or targets").  Plaintiff is

8    incorrect in asserting that the question of whether the CIA possesses responsive records

9    does not fall within any category of classifiable information.[4]

10        The CIA properly used a Glomar Response in refusing to confirm or deny the

11   existence of responsive records that would reveal a classified connection to the CIA

12   under FOIA Exemption (b)(1) pursuant to Executive Order No. 1352675.

13

14            **2.      FOIA Exemption (b)(3)**

15

16        FOIA Exemption 3 applies to records that are specifically exempted from

17   disclosure by other federal statutes "provided that such statute affords the agency no

18   discretion on disclosure, establishes particular criteria for withholding the information, or

19   refers to the particular types of material to be withheld." Minier v. Cent. Intelligence

20   Agency, 88 F.3d 796, 800-01 (9th Cir. 1996) (internal citations omitted).  "A two-part

21   inquiry determines whether Exemption 3 applies to a given case.  First, a court must

22   determine whether there is a statute within the scope of Exemption 3.  Then, it must

23   determine whether the requested information falls within the scope of the statute."  Id.

24   ///

_____

25        [4] Further, Plaintiff submitted no evidence to contradict the CIA's showing of proper classification.

26   See Richards, 602 F. Supp. at 1244-45 (E.D. Cal. 1985) (explaining that at the summary judgment stage,
     it is the opposing party's obligation to produce a factual predicate from which an inference may be drawn).
     When the CIA met its initial responsibility under FRCP 56(a), the burden shifted to Plaintiff to establish that

27   a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co., 475 U.S. at
     586-87.  Plaintiff presented no evidence to establish a genuine issue as to whether any disputed material

28   fact exists.

///

The applicability of Exemption 3 "depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd., 830 F.2d 331, 336 (D.C. Cir. 1987).

Here, the CIA argues that the Glomar Response is proper under FOIA exemption 3 pursuant to two statutes: Section 102A(i)(1) of the National Security Act and (2) the Central Intelligence Agency Act of 1949. See 50 U.S.C. § 3024(i)(1) (formerly cited as 50 U.S.C. § 403-1); 50 U.S.C. § 3507 (formerly cited as 50 U.S.C. § 403g).

Section 3024(i)(1) provides that the Director of the CIA shall "protect intelligence sources and methods from unauthorized disclosure." Courts note that this section includes "very broad authority to protect all sources of intelligence information from disclosure." Hunt, 981 F.2d at 1119. In Hunt, the Ninth Circuit went so far as to note that the "sources and methods" statutory mandate is a "near-blanket FOIA exemption," which is "only a short step [from] exempting all CIA records from FOIA." Id. at 1120, 1121 (internal citations omitted); see Minier, 88 F.3d at 801 (relying on Hunt's broad interpretation of the "sources and methods" statutory mandate). Section 3507 states that the CIA is exempted from disclosing "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507.

Plaintiff contends that confirming or denying the existence of documents responsive to some or all aspects of Plaintiff's FOIA request would not reveal "intelligence sources or methods" within the meaning of the CIA Act and NSA Act because the information requested was limited to information regarding Plaintiff, a non-intelligence related U.S. citizen; not an intelligence source or method. Plaintiff also argues that confirming or denying the existence of responsive documents would not reveal a "function" of the CIA within the meaning of the CIA Act.

Courts grant the CIA tremendous deference in defining what constitutes harm to intelligence sources and methods.

1    ///

2    Once a district court finds that the requested information constitutes "intelligence sources

3    and methods", the "CIA's assertions of harm to intelligence sources and methods under

4    the National Security Act are accorded great deference."  Int'l Counsel Bureau v.

5    U.S.C.I.A., 774 F. Supp. 2d 262, 274 (D.D.C. 2011) (allowing the use of a Glomar

6    Response where the CIA affidavit argued "that it can neither confirm nor deny the

7    existence or nonexistence of records on a particular foreign national in order 'to

8    safeguard intelligence sources and methods, as well as U.S. foreign relations'").  In

9    addition, CIA need not identify particular harms that would occur if the documents are

10   disclosed.  Berman v. C.I.A., 501 F.3d 1136, 1142 (9th Cir. 2007) (finding that the CIA's

11   statements were sufficient because "a more specific response might allow foreign

12   intelligence agents to 'determine the contours and gaps of CIA intelligence operations

13   and make informed judgments as to the identities of probable sources and targets in

14   other countries,' and that disclosure might prove to be a disincentive to future sources

15   providing assistance the CIA").

16         Although the CIA's concerns regarding harm to intelligence sources and methods

17   are often theoretical, a court "must take into account . . . that any affidavit or other

18   agency statement of threatened harm to national security will always be speculative to

19   some extent, in the sense that it describes a potential future harm.  Ultimately, an

20   agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or

21   'plausible.'"  Wolf, 473 F.3d at 374-75 (internal citations omitted).  The Supreme Court

22   noted that the definition of intelligence source must not ignore "the realities of

23   intelligence work, which often involves seemingly innocuous sources as well as

24   unsuspecting individuals who provide valuable intelligence information."  C.I.A. v. Sims,

25   471 U.S. 159, 176 (1985).  As a result, "the Director of Central Intelligence may protect

26   all intelligence sources, regardless of their provenance."  Wolf, 473 F.3d at 377 (internal

27   citations omitted).

28   ///

1   ///

2   "The test is not whether the court personally agrees in full with the CIA's evaluation of

3   the danger—rather, the issue is whether on the whole record the Agency's judgment

4   objectively survives the test of reasonableness, good faith, specificity, and plausibility in

5   this field of foreign intelligence in which the CIA is expert and given by Congress a

6   special role." Gardels v. C. I. A., 689 F.2d 1100, 1105 (D.C. Cir. 1982).

7          "Congress intended to give the Director of Central Intelligence broad power to

8   protect the secrecy and integrity of the intelligence process." Hunt, 981 F.2d at 1120

9   (quoting C.I.A. v. Sims, 471 U.S. 159, 170 (1985)).  The Ninth Circuit thus observed that

10  "[i]n light of the Director's extensive power to protect . . . sources and methods . . . we

11  are now only a short step [from] exempting all CIA records" from FOIA.  Id. at 1120.

12  Nevertheless, courts must still "conduct some meaningful—albeit restrained—review of

13  the CIA's assertions." Berman, 501 F.3d at 1140.  In completing this evaluation, district

14  courts are required "to accord 'substantial weight' to the CIA's affidavits." Hunt, 981 F.2d

15  at 1119.  "The CIA affidavits must describe the justifications for nondisclosure with

16  reasonably specific detail, demonstrate that the information withheld logically falls within

17  the claimed exemptions, and show that the justifications are not controverted by contrary

18  evidence in the record or by evidence of CIA bad faith." Id.  Where the "CIA's central

19  concern . . .  is that disclosure would reveal CIA sources and methods; there is no

20  requirement under Sims that the revelation cause a high degree of damage to CIA

21  intelligence gathering." Id. at 1120.

22         Although courts require that the affidavits contain reasonably specific detail,

23  whether the affidavit meets this criteria is a fact intensive inquiry based on the specifics

24  of the particular case.  A court will uphold the use of a Glomar Response where the

25  affidavits are "as specific as possible given the nature of the information the CIA sought

26  to protect." Hunt, 981 F.2d at 1120.  For example, in Gardels v. C. I. A., 689 F.2d 1100,

27  1102 (D.C. Cir. 1982), the court upheld the agency's use of a Glomar Response in

28  responding to a FOIA request requesting the CIA's contacts with the University of

1   California.

2   The CIA affidavits argued that the "Agency needs, and uses as intelligence sources,

3   covert contacts." Id. at 1103.  The affidavits in question did not mention harm to any

4   particular individuals.  Id.; see Hunt, 981 F.2d at 1119-20 (citing Gardels with approval).

5   The court found that in that instance, "[t]he CIA position, detailed in affidavits and

6   depositions, [was] specific and fleshed out as much as it can be done publicly, and [was]

7   far from being merely conclusory; as a whole it appears 'logical' and 'plausible' in

8   protecting our intelligence sources and methods from foreign discovery."[5]  Gardels, 689

9   F.2d at 1105.

10      In the CIA's declaration, Lutz stated the CIA's rationale that "acknowledging the

11  existence or nonexistence of records reflecting a classified connection to the CIA would

12  reveal information that concerns intelligence sources and methods, which the National

13  Security Act is designed to protect."  ECF No. 26-1; Lutz Decl. ¶ 54.  Lutz explained that

14

15          merely acknowledging that the CIA possesses records
            reflecting a classified connection to Plaintiff would reveal that
16          Plaintiff was a target of intelligence collection.
            Acknowledging the absence of such records would reveal
17          that Plaintiff was not a target of collection.  In either case,
            such an admission would implicate intelligence sources and
18          methods in a manner harmful to U.S. national security,
            because it would reveal to Plaintiff and the public facts about
19          the CIA's clandestine activities.

20  ECF No. 26-1; Lutz Decl. ¶ 52.  Lutz therefore concluded that the mere fact of whether

21  classified records exist is properly exempt under Section 552(b)(1).

22      "Courts are generally ill-equipped to second-guess an agency's opinion in the

23  national security context" and "the government's burden [with regard to such matters] is

24  a light one."  Moore v. F.B.I., 883 F. Supp. 2d 155, 164 (D.D.C. 2012).

25  _____

26      [5] Although the use of Glomar Responses are often invoked in cases involving foreign nationals,
    courts have upheld their use to protect domestic sources.  See Fitzgibbon v. C.I.A., 911 F.2d 755, 764-65
27  (D.C. Cir. 1990) (observing that the fact that the CIA "has no domestic intelligence role is entirely
    harmonious with the rather pedestrian observation that the Agency must, at times, pursue domestically its
28  foreign intelligence mandate. As the Supreme Court noted in Sims, a vast amount of intelligence material
    is derived from domestic sources").

1   The declaration submitted by the CIA conveys a legitimate concern for the discovery of

2   the Agency's "sources and methods."  Lutz's declaration discusses the agency's

3   reasoning behind not disclosing information that could disclose targets and methods of

4   intelligence gathering and this rationale appears 'logical' or 'plausible.'  The CIA's

5   acknowledgement of a classified connection with Plaintiff could reveal that Plaintiff was a

6   target or source of intelligence collection.

7           Courts routinely allow the CIA to give a Glomar Response in order to avoid

8   identifying its methods or targets, and their activities.  See, e.g., Bassiouni v. C.I.A., 392

9   F.3d 244, 245 (7th Cir. 2004) (Glomar Response necessary to avoid "reveal[ing] details

10  about intelligence-gathering methods"); Frugone v. CIA, 169 F.3d 772, 774 (D.C. Cir.

11  1999) (Glomar Response necessary to avoid acknowledgment of employment); Minier v.

12  CIA, 88 F.3d 796, 801-02 (9th Cir.1996) (Glomar Response necessary to avoid revealing

13  if person was a CIA agent).  Courts also routinely allow the CIA to avoid describing its

14  intelligence-gathering activities by employing a Glomar Response.  See, e.g., Miller v.

15  Casey, 730 F.2d 773, 774 (D.C. Cir. 1984) (upholding Glomar Response to request for

16  "information concerning alleged efforts by the United States and other countries to

17  infiltrate intelligence agents and potential guerrillas into Albania during the period 1945-

18  53"); Gardels, 689 F.2d at 1102-03 (upholding Glomar Response to request by a student

19  at the University of California for "documents revealing covert CIA connections with or

20  interest in the University").

21          In fact, "[e]very appellate court to address the issue has held that the FOIA

22  permits the CIA to make a 'Glomar Response' when it fears that inferences from Vaughn

23  indexes or selective disclosure could reveal classified sources or methods of obtaining

24  foreign intelligence."  Bassiouni v. CIA, 392 F.3d 244, 246 (7th Cir.2004); see Am. Civil

25  Liberties Union v. Dep't of Def., 389 F. Supp. 2d 547, 562-63 (S.D.N.Y. 2005) ("the

26  courts generally respect the CIA's right to make a Glomar Response.").

27          Here, Lutz's declaration adequately explains the Agency's conclusion that a

28  Glomar Response is required to protect intelligence sources and methods.

1    Section 3024(i)(1) provides that the Director of the CIA shall "protect intelligence sources

2    and methods from unauthorized disclosure."   The requested information falls within the

3    scope of this statute.  Requiring the CIA to disclose whether a classified relationship

4    between Plaintiff and the Agency exists may reveal an intelligence source.  In addition,

5    inconsistent use of the Glomar Response would be incompatible with the CIA's efforts to

6    keep its sources and methods free from unwarranted disclosure.  In light of the Director's

7    extensive power to protect these sources and methods, this Court concludes that the

8    CIA's response to Plaintiff's FOIA request was proper under FOIA Exemption 3.

9

10             **3.       Public Acknowledgment or Bad Faith**

11

12           Once an agency establishes the proper use of a Glomar Response, an opposing

13   party may defeat the response by showing either that the existence or nonexistence of

14   the specific records sought by the FOIA request has been the subject of an official public

15   acknowledgment or that the agency is acting in bad faith.  See Wilner v. Nat'l Sec.

16   Agency, 592 F.3d 60, 70 (2d Cir. 2009).  "In evaluating a claim for exemption, a district

17   court must accord 'substantial weight' to CIA affidavits, provided the justifications for

18   nondisclosure "are not controverted by contrary evidence in the record or by evidence of

19   CIA bad faith."  Minier, 88 F.3d at 800 (internal citations omitted).

20           Here, Plaintiff presented no evidence to support a showing that any classified

21   records have been publically acknowledged or that the agency acted in bad faith.

22   Plaintiff attempts to argue that because the CIA acknowledged that it once held a non-

23   classified security file on Plaintiff that has since been deleted, the CIA may not invoke a

24   Glomar Response.  In his filings, Plaintiff conflates these two separate responses by

25   arguing that because the CIA acknowledged once maintaining an open or unclassified

26   file that was destroyed in 1996, the Agency has waived its Glomar Response.  Plaintiff is

27   mistaken.

28   ///

1  "A plaintiff asserting a claim of prior disclosure must bear the initial burden of

2  pointing to specific information in the public domain that appears to duplicate that being

3  withheld."  Afshar v. Dep't of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

4
5
6
7
> The prior disclosure must meet three criteria:  First, the information requested must be as specific as the information previously released.  Second, the information requested must match the information previously disclosed . . .Third, . . .  the information requested must already have been made public through an official and documented disclosure."

8
Wolf, 473 F.3d at 378 (internal citations omitted).

9  Here, Plaintiff states, and the record reflects, only that the CIA at one time

10  maintained a security file on Plaintiff and that said file was destroyed in 1996.  This

11  minimal information does not meet any of the three requirements for a claim of prior

12  disclosure.  Plaintiff cannot demonstrate that the security file contained the same or even

13  similar information as any classified information that may (or may not) exist and whose

14  existence is protected by the Glomar Response.  See, e.g., Afshar, 702 F.2d at 1130

15  (noting that even if the CIA at one time acknowledged the existence of an intelligence

16  relationship with a source, this does not automatically lead to the disclosure of new

17  information regarding the extent and nature of the liaison).  Because Plaintiff presented

18  no evidence to support a showing that any classified records have been publicly

19  acknowledged or that the Agency acted in bad faith, he cannot defeat the CIA's proper

20  use of a Glomar Response.

21
22  **B.     Adequacy of the Lunz Declaration**

23
24  The CIA supported its motion for summary judgment with a declaration from

25  Martha M. Lutz, the Chief of the Litigation Support Unit of the Central Intelligence

26  Agency.  ECF No. 26-1.  Plaintiff contends that Lutz's declaration fails to adequately

27  demonstrate how disclosure of the requested information will reveal an intelligence

28  source or method or result in harm to national security.

17

1  Plaintiff also separately submitted evidentiary objections to the Lutz Declaration as being

2  conclusory, vague, and ambiguous and therefore inadequate to support CIA's motion for

3  summary judgment.  ECF No. 35.

4          An agency may establish one or more FOIA exemptions "by submitting a detailed

5  affidavit showing that the information logically falls within the claimed exemptions."

6  Minier v. Cent. Intelligence Agency, 88 F.3d at 800.  FOIA exemptions require "as

7  detailed public disclosure as possible of the government's reasons for withholding

8  documents under a FOIA exemption."  Lion Raisins v. U.S. Dep't of Agric., 354 F.3d

9  1072, 1083 (9th Cir. 2004).  This disclosure "is necessary to restore, to the extent

10  possible, a traditional adversarial proceeding by giving the party seeking the documents

11  a meaningful opportunity to oppose the government's claim of exemption."  Id.

12  Boilerplate affidavits are not sufficient to sustain the government's burden.  Wiener v.

13  Federal Bureau of Investigation, 943 F.2d 972, 978-79 (9th Cir. 1991).  If the

14  government's affidavits are "too generalized, the district court may, in its discretion,

15  examine the disputed documents in camera in order to make a first-hand determination.

16  Lewis, 823 F.2d at 378 (emphasis in original) (internal citations omitted).

17          For purposes of summary judgment in FOIA cases, affidavits describing the

18  agency's search procedures are sufficient "if they are relatively detailed in their

19  description of the files searched and the search procedures, and if they are

20  nonconclusory and not impugned by evidence of bad faith."  Zemansky, 767 F.2d at 573.

21  Once an agency meets its initial burden in this regard, its position can be rebutted "only

22  by showing that the agency's search was not made in good faith."  Maynard v. CIA,

23  986 F.2d 547, 560 (1st Cir. 1993) (citing Miller v. U.S. Dep't of State, 779 F.2d 1378,

24  1383 (8th Cir. 1985)).  Because agency affidavits are accorded a presumption of good

25  faith, they cannot be rebutted by "purely speculative claims about the existence and

26  discoverability of other documents."  Maynard, 986 F.2d at 560 (quoting SafeCard

27  Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).

28  ///

1    An agency "need not specify its objections [to disclosure] in such detail as to

2  compromise the secrecy of the information. . . . If the affidavits contain reasonably

3  detailed descriptions of the documents and allege facts sufficient to establish an

4  exemption, the district court need look no further." Lewis v. I.R.S., 823 F.2d 375, 378

5  (9th Cir. 1987) (internal citations omitted).  In evaluating a claim for exemption, a district

6  court must accord substantial weight to CIA affidavits, provided the justifications for

7  nondisclosure are not controverted by contrary evidence in the record or by evidence of

8  CIA bad faith." Minier v. Cent. Intelligence Agency, 88 F.3d 796, 800 (9th Cir. 1996)

9  (internal citations omitted); see Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir.

10 2009) (internal citations omitted) ("Summary judgment is warranted on the basis of

11 agency affidavits when the affidavits describe the justifications for nondisclosure with

12 reasonably specific detail, demonstrate that the information withheld logically falls within

13 the claimed exemption, and are not controverted by either contrary evidence in the

14 record nor by evidence of agency bad faith."). "In reviewing an agency's Glomar

15 Response, this Court exercises caution when the information requested implicates

16 national security, a uniquely executive purview." Elec. Privacy Info. Ctr. v. Nat'l Sec.

17 Agency, 678 F.3d 926, 931 (D.C. Cir. 2012) (internal citations omitted).

18    Because the CIA's affidavit provided a sufficient basis for establishing FOIA

19 exemptions 1 and 3 as proper bases of the CIA's Glomar Response, this Court finds that

20 the Lutz declaration was adequate.  This is particularly true in a case such as this, where

21 Plaintiff submitted no evidence to contradict Lutz's declaration nor did he submit any

22 evidence of bad faith on the CIA's part.  This Court therefore accords substantial weight

23 to the Lutz affidavit.

24    The CIA declaration provided sufficient information to support a finding that the

25 Agency properly justified its Glomar Response on FOIA exemptions 1 and 3.  Lutz stated

26 that merely acknowledging that the CIA possesses records reflecting a classified

27 connection to Plaintiff would reveal that Plaintiff was a target of intelligence collection.

28 ///

1   The declaration adequately reasoned that stating whether a classified relationship exists

2   could reveal clandestine CIA intelligence activities and intelligence sources and

3   methods.   In addition, Lutz cautioned that the effectiveness of a Glomar Response

4   depends on the Agency's consistent use of the Glomar Response to all requests where

5   the existence or nonexistence of records is classified.  Inconsistent use of Glomar could

6   therefore be interpreted as a de facto admission by the CIA that classified records exist.

7   Here, the Lutz declaration and its explanation regarding the CIA's use of Glomar

8   Responses and the potential harm in disclosing the existence of classified relationships

9   is logical and plausible.  This Court finds that the CIA's declaration adequately

10   demonstrated how disclosure of the requested information may reveal an intelligence

11   source or method and adequately supported the CIA's use of FOIA Exemptions 1 and 3.

12

13       **C.       Propriety of an *In Camera* Review**

14

15       In the alternative, Plaintiff requests an *in camera* review of any responsive

16   documents that would reveal a classified connection to the CIA.  Plaintiff contends that

17   because the number of pages in question in the present case may be low, an *in camera*

18   review is appropriate because it would impose a small burden on the Court.

19       Plaintiff cites Allen v. Cent. Intelligence Agency, 636 F.2d 1287, 1299 (D.C. Cir.

20   1980), for the notion that where the number of pages in question is limited, *in camera*

21   review is the correct judicial remedy for resolving a plaintiff's contested FOIA request.

22   ECF No. 34 at 20 ("In Allen, the Court of Appeal emphasized that the document at issue

23   in that case was only 15 pages and '[i]f ever there were a case in which in camera

24   inspection offered the most efficient technique for conducting de novo review, this is it.'").

25   However, Allen is not helpful because that case did not concern a Glomar Response.  In

26   Allen, the CIA refused to disclose the contents of a 15-page document containing

27   information related to the assassination of President Kennedy.  Allen, 636 F.2d at 1288.

28   The parties in Allen did not dispute the existence of the document.  Id.

1       A district court has within its discretion the power to order an *in camera* review of

2 exempted documents.  5 U.S.C. § 552(a)(4)(B); see also Lewis, 823 F.2d at 378.

3 However, an *in camera* review would be inapposite in this situation because there may

4 be no records to review.  An *in camera* review, like a Vaughn index, would necessarily

5 require the CIA to acknowledge whether any classified records exist—the very reason

6 the Agency used a Glomar Response.  "When the Agency's position is that it can neither

7 confirm nor deny the existence of the requested records, there are no relevant

8 documents for the court to examine other than the affidavits which explain the Agency's

9 refusal."  Wolf, 473 F.3d at 374 n. 4 (rejecting a Plaintiff's request for a Vaughn index).

10 As this Court finds that the CIA's Glomar Response is proper, an *in camera* review is not

11 appropriate under these circumstances.

12       In addition, the Ninth Circuit discourages reliance on *in camera* inspections

13 because it distorts the adversarial process.  Maricopa Audubon Soc. v. U.S. Forest

14 Serv., 108 F.3d 1089, 1093 n. 2. (9th Cir. 1997).  "In camera review is appropriate only if

15 the preferred alternative to in camera review-government testimony and detailed

16 affidavits-has first failed to provide a sufficient basis for a decision."  Id.; see, e.g., Int'l

17 Counsel Bureau v. U.S. C.I.A., 774 F. Supp. 2d 262, 266 (D.D.C. 2011) (citing Military

18 Audit Project v. Casey, 656 F.2d 724, 738 (D.C.Cir.1981) (noting that a district court may

19 grant summary judgment to an agency based solely on an adequate declaration).  Here,

20 where the CIA's declaration provides an adequate basis for determining the propriety of

21 the CIA's Glomar Response, an *in camera* is unnecessary.

22       The Court rejects Plaintiff's request for an *in camera* review.

23

24      **D.**    **Adequacy of Search**

25

26       Finally, Plaintiff contends that the CIA improperly limited the search for the

27 requested documents when it searched only two of its five directorates for responsive

28 documents.

1  Plaintiff argues that the CIA decided to limit the search for its own convenience.  Plaintiff

2  provided no evidence to supports its claim and the Court is unpersuaded by Plaintiff's

3  argument.

> An agency must demonstrate that it conducted a search
> reasonably calculated to uncover all relevant documents. . . .
> the issue to be resolved is not whether there might exist any
> other documents possibly responsive to the request, but
> rather whether the search for those documents was
> adequate. The adequacy of the search, in turn, is judged by a
> standard of reasonableness and depends, not surprisingly,
> upon the facts of each case. In demonstrating the adequacy
> of the search, the agency may rely upon reasonably detailed,
> nonconclusory affidavits submitted in good faith.

10  Zemansky v. U.S. E.P.A., 767 F.2d 569, 571 (9th Cir. 1985).

11         Lutz's Declaration explains in detail the Agency's procedures for processing FOIA

12  requests.  See Lutz Decl. ¶¶ 12-20, ECF No. 26-1.  All FOIA requests sent to the CIA

13  are submitted to the Information and Privacy Coordinator, Information Management

14  Services ("IMS").  According to Lutz, when the CIA receives a new FOIA request, "under

15  the direction and supervision of the CIA Information and Privacy Coordinator,

16  experienced IMS professional analyze the request and determine which CIA

17  components reasonably might be expected to possess responsive records."   Lutz Decl.

18  ¶ 12, ECF No. 26-1.  The CIA is divided into five directorates or office clusters: the

19  National Clandestine Service ("NCS"), the Directorate of Intelligence ("DI"), the

20  Directorate of Science and Technology ("DS&T"), the Directorate of Support ("DS"), and

21  the Director of CIA Area ("DIR Area").  Lutz Decl. ¶ 13, ECF No. 26-1.

22         With respect to Plaintiff's specific objections, Lutz explained that when IMS

23  received Plaintiff's request it was reviewed by IMS professionals and "tasked to the

24  directorates reasonably likely to have records that are subject to the FOIA and Privacy

25  Act and are responsive to the request."  Lutz Decl. ¶ 21, ECF No. 26-1.  "The CIA

26  determined that the DS and the NCS were the directorates reasonably likely to possess

27  responsive records."  Lutz Decl. ¶ 21, ECF No. 26-1.

28  ///

1  "Given Plaintiff's allegations regarding his alleged contact with the CIA, the NCS was

2  determined to be reasonably likely to possess records reflecting an overt connection to

3  the CIA, if any existed, because the NCS is the directorate within the CIA responsible for

4  the clandestine collection of foreign intelligence from human sources."  Lutz Decl. ¶ 22,

5  ECF No. 26-1.   The CIA also searched its DS directorate because its units "house the

6  personnel and physical security functions of the CIA and would be most likely to contain

7  records of individuals who were applicants, contractors, or employees of the CIA or

8  otherwise had an overt or acknowledged relationship with the CIA."  Lutz Decl. ¶ 23,

9  ECF No. 26-1.  Neither the NCS nor the DS located any records that reflected an open

10  and acknowledged CIA affiliation and were responsive to Plaintiff's request.  Lutz Decl. ¶

11  22-23, ECF No. 26-1.  However, the CIA "Office of Security determined that a security

12  file on Plaintiff did exist but the file was destroyed in 1996 in accordance with established

13  records control schedules."  Lutz Decl. ¶ 23, ECF No. 26-1.  Lutz stated that the CIA

14  limited its search to two directorates because:

15
16
17
18
19
20
21
22

> IMS professionals determined that no other directorate's files
> subject to FOIA were reasonably likely to contain records
> reflecting an overt or acknowledged connection to the subject
> of the request:  There was no indication that the subject had
> an overt or acknowledged connection to CIA intelligence
> analysis or the Director's offices and therefore no indication
> the files of the DI or DIR Area were reasonably likely to
> contain responsive records reflecting an overt or otherwise
> acknowledged connection; similarly there was no indication
> that the subject had an overt or acknowledged connection to
> CIA intelligence technology and therefore no indication that
> the files of the DS&T were reasonably likely to contain
> responsible records reflecting an overt or otherwise
> acknowledged connection.

23  Lutz Decl. ¶ 24, ECF No. 26-1.

24       Lutz's declaration explains in a detailed manner the steps taken by the CIA in

25  searching for records responsive to Plaintiff's request.  The CIA conducted a search of

26  its two directorates that it reasonably concluded were likely to have records subject to

27  Plaintiff's FOIA.  Lutz adequately explained why, based on Plaintiff's request, these two

28  directorates were chosen for review.

1    There is no evidence to suggest that the declaration was not submitted in good faith.

2    Plaintiff alleges that the search was limited for the agency's own convenience, but

3    submitted no evidence to support this contention.

4         To the extent that Plaintiff contests the adequacy of search as it relates to

5    classified records, because the Court has already determined that the CIA's Glomar

6    Response was appropriate, review of the adequacy of the search is unnecessary.  See,

7    e.g., Wolf, 473 F.3d at 374 n. 4 (noting that the adequacy of the search not at issue

8    when a Glomar Response is at issue).

9         The CIA's search for responsive, non-exempt documents was reasonable and

10   adequate in light of facts presented to the Agency in Plaintiff's FOIA request.

11

12                                **CONCLUSION**

13

14        For the reasons set forth above, the Court concludes that CIA properly complied

15   with Plaintiff's FOIA request that is the subject of this lawsuit.  As such, CIA is entitled to

16   summary judgment in its favor.  Defendant's Motion for Summary Judgment (ECF

17   No. 26) is GRANTED as to all claims.  Plaintiff's Motion for Summary Judgment (ECF

18   No. 37) is DENIED as to all claims.  The Clerk of the Court is directed to enter judgment

19   in favor of Defendant and to close the case.

20        IT IS SO ORDERED.

21   Dated:  November 26, 2013

22

23

24   _____
     MORRISON C. ENGLAND, JR., CHIEF JUDGE
25   UNITED STATES DISTRICT COURT

26

27

28

                                    24